322 F.2d 737
 Walter P. McFARLAND, Edward P. Johnson, and John Loughran, Plaintiffs-Respondents,
v.
George S. GREGORY, Alexander Westreich, N. V. Handelmaatschappij Antilia, Sol Drescher, and Louis Rosenberg, Defendants-Appellants.
 No. 334.
 Docket 28065.
 United States Court of Appeals Second Circuit.
 Argued April 25, 1963.
 Decided July 5, 1963.
 As Amended by Court after Filing of Petition for Rehearing September 18, 1963.
 
 Gallop, Climenko & Gould, New York City (Milton S. Gould, Alan J. Hartnick, New York City, of counsel), for plaintiffs-respondents.
 Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Simon H. Rifkind, Edward N. Costikyan, Gerald D. Stern, New York City, of counsel), for defendants-appellants.
 Before LUMBARD, Chief Judge, and WATERMAN and MOORE, Circuit Judges.
 WATERMAN, Circuit Judge.
 
 
 1
 Plaintiffs below were the developers of a real estate project outside Washington, D. C., known as "Arlington Towers." The project consists of an 18-acre tract of land in Virginia, four multi-story apartment buildings, and a shopping center. In April 1957, plaintiffs were required, because of financial difficulties, to sell all the issued outstanding stock and debentures of the corporation developing the project to persons known as the Kaufman Group. As part of the sales agreement, plaintiffs were given, at an agreed price, a call on the securities or an option to repurchase them within one year.
 
 
 2
 Thereafter, plaintiffs entered into two agreements with defendants below, the Gregory group. The first, or main, agreement provided for the transfer of the call to, and its exercise by, the defendants, in return for which plaintiff McFarland was to receive $250,000 in two installments. That agreement is not involved on this appeal.
 
 
 3
 The second, or memorandum, agreement provided for certain rights of the parties after defendants' acquisition of the Arlington securities. For present purposes, the most important provision of this agreement gave plaintiff McFarland the right to receive a share of the profits from the resale of the project if McFarland could find a buyer for the properties, at an agreed price, within 39 months of April 15, 1957.
 
 
 4
 The history of the parties' relationship under these agreements has been one of continuing dispute, both as to the nature of their obligations and as to their respective performances. In July 1957, when McFarland had approximately 36 months within which to find a buyer, defendants claimed that plaintiffs had breached certain warranties and representations concerning the value of the Arlington properties. Thereupon defendants withheld their further performance under the agreements, including payment of a $150,000 balance on the $250,000 due McFarland. In September 1957, plaintiffs, citizens of the Commonwealth of Virginia, commenced this diversity action against defendants, New York State residents and others, in the United States District Court for the Southern District of New York, seeking reformation of the agreements and, when reformed, their specific performance. Defendants counterclaimed, alleging damages for breach of warranty.
 
 
 5
 After a trial below, Judge Dimock ruled, on June 30, 1961, that plaintiffs were entitled to specific performance and held that no warranties or representations in the sale of the Arlington properties had been breached. The judgment and decree of specific performance, entered on October 11, 1961, also provided that McFarland's time to find a buyer for the Arlington properties should be extended from July 15, 1960, the original expiration date under the contract, to June 30, 1964. Defendants did not appeal from this portion of the decree which was framed, as Judge Dimock stated in his opinion of June 30, 1961, to provide plaintiffs "a period sufficiently long to give McFarland time for performance equal to that which was still available to him on July 25, 1957, under the terms of the agreement."
 
 
 6
 During the spring of 1962, new disagreements arose between the parties concerning McFarland's rights under the agreements and the decree of specific performance. McFarland contended, and defendants denied, that as an implied condition precedent to his right to find a buyer for an individual building, or some of the buildings, in the Arlington complex, defendants should promptly separate, or obtain commitments to separate, the project mortgages and ground lease as between various units of the project. McFarland also demanded that defendants promptly discharge, or obtain commitments to discharge, all liens and encumbrances on the apartment buildings.
 
 
 7
 On March 2, 1962, defendants made a motion before Judge Dimock for further relief at the foot of the original decree to dispose of the newly-arisen disputes indicated above. In his answering papers, plaintiff McFarland requested construction of various additional provisions of the agreements, including a provision relieving defendants of any obligation to sell,
 
 
 8
 "unless it has been determined to the satisfaction of the counsel of the Gregory Group that profits realized in connection with the sale would, upon distribution thereof to the individual stockholders of Arlington, be taxable to them * * * as capital gain and not as ordinary income."
 
 
 9
 In an opinion dated June 19, 1962, Judge Dimock ruled with defendants and rejected plaintiff McFarland's interpretation of the agreement relative to the separation of the mortgages and lease and the discharge of all liens and encumbrances. The court further ruled, however, that defendants should forthwith seek and furnish the required tax opinion rather than delaying until a buyer for the Arlington properties had been produced by McFarland. The supplemental judgment and decree, entered November 14, 1962, further provided that McFarland's rights to find a buyer for the Arlington properties and to share in the profits of the sale should be extended for an additional period equal to the number of days,
 
 
 10
 "(i) in the period from March 2, 1962, the date of defendants' motion herein, to the date of the furnishing of an opinion of tax counsel * * *; and
 
 
 11
 "(ii) if an appeal is taken from this judgment and decree, in the period between the date of this Judgment and Decree and the date of the final disposition of such appeal, or, if no such opinion is furnished until thereafter, the date of the furnishing of such opinion."
 
 
 12
 Defendants prosecute this appeal from the provision of the supplemental decree just quoted which extends the time of McFarland's rights under the agreements. They contend that the extension was a gross abuse of discretion and that it granted to McFarland rights different in kind and quality from those provided by the contract of the parties. We affirm the judgment and decree below, subject to a modification to be discussed hereafter.
 
 
 13
 In a contract action, the determination whether specific performance shall be decreed rests in the sound discretion of the trial court. 2 Restatement, Contracts § 359(1). In framing such a decree the performance that it requires need not be identical with that promised in the contract. It is within the bounds of judicial discretion, therefore, to extend the time within which an obligation may be performed. Id. at § 359(2); 5 Williston, Contracts § 1424 (rev. ed. 1937); Haener v. Albro, 73 Idaho 250, 249 P.2d 919 (1952); see Lissau v. Smith, 215 Md. 538, 138 A.2d 381, 384-385 (1958).
 
 
 14
 Under the contract before us, McFarland was granted a 39-month period during which to find a buyer for the Arlington properties at a price that would permit McFarland to realize a share of the profits from the sale. Defendants defeated that right initially by refusing to perform under the contract. It is conceded, therefore, that Judge Dimock, on June 30, 1961, acted reasonably in extending the time limit on plaintiff's rights from July 15, 1960 to June 30, 1964.
 
 
 15
 On March 2, 1962, twenty-eight months before plaintiff's rights were to expire, defendants reopened the litigation by making a motion for a further clarification of the contract and of the decree based thereon. By so doing, defendants again erected an obstacle to the exercise by McFarland of his rights. As a practical matter, that obstacle defeated his rights just as effectively as defendants' prior refusal to perform under the contract. Prospective buyers of expensive real estate parcels do not offer to purchase a lawsuit or to buy a pig in a poke.
 
 
 16
 If the defendants had been at fault in this second interference with McFarland's rights, as they had been in the first, the propriety of the second extension of time granted by Judge Dimock could hardly be contested. Fault on the part of defendants was not, however, the basis for the time extension appealed from. Indeed, in these supplemental proceedings, Judge Dimock largely accepted defendants' interpretations of the agreement and rejected those of the plaintiffs.
 
 
 17
 The second extension of time for the exercise of McFarland's rights was premised upon the ambiguous nature of the agreement in suit, and Judge Dimock acknowledged the reasonableness of the parties' conflicting interpretations of their respective obligations thereunder. Therefore, in the absence of record information to the contrary, we must assume that McFarland's position in the dispute, as well as that taken by the defendants, was taken in good faith. Under these circumstances, to permit a deduction of the period consumed by litigation concerning the substance of plaintiffs' rights from time allowed for the exercise of the rights would be to place all the risks of the conceded contractual ambiguities upon plaintiffs' shoulders. By contrast, to extend the expiration date of plaintiffs' rights would restore plaintiffs to the status quo ante and would subject defendants to no clearly-specified disadvantage.[1] We hold, therefore, that Judge Dimock did not abuse his discretion by extending the limit within which McFarland's rights could be exercised for a period that would equal that consumed in the supplemental proceedings below and for the period required to secure the tax opinion.
 
 
 18
 Although the question is a closer one, we cannot say that Judge Dimock exceeded the bounds of his discretion by also including in the extension of time he ordered a period equal to the time consumed by any appeal the defendants might take from that order. When the decree below was entered, defendants were free to appeal from all of its provisions, from those involving McFarland's substantive rights as well as from those granting the extension of time within which those rights could be exercised. Moreover, even though defendants elected only to appeal the provisions of the decree extending McFarland's time, McFarland's right of "sale" remained clouded by uncertainty concerning the duration of that right. Whether a given offer to purchase will be accepted or rejected by the seller may depend, in part, upon the time available to seek more favorable offers.
 
 
 19
 It is claimed that the language of the decree may be interpreted to extend McFarland's rights by a period equal to the time (1) from March 2, 1962 to the date of the furnishing of the required tax opinion, in addition to (2) the period from entry of the decree below to the date of final disposition of this appeal. As the tax opinion could be prepared concurrently with the prosecution of this appeal, such an interpretation would, if the opinion were so prepared, unduly extend the time for the exercise of McFarland's rights. We amend the decree, therefore, to provide for an additional period
 
 
 20
 "equal to the number of days in the period between March 2, 1962, and (1) the disposition of any appeal taken by defendants or (2) the date on which the required tax opinion is provided, whichever is later."
 
 
 21
 The decree of the district court is modified as provided herein, and, as so modified, is affirmed.
 
 
 
 Notes:
 
 
 [1]
 The primary harm which defendants envision from an extension of the time limit on McFarland's rights is that "worthless rights * * * may increase in value to a point where they are valuable." Such an eventuality, however, would not operate wholly to defendants' disadvantage. From the record before us it would appear that defendants' investment in acquiring the Arlington properties was approximately $1,600,000. Under the terms of the memorandum agreement, defendants were not obligated to sell the Arlington securities unless McFarland could find a buyer willing to pay a price which would yield a profit of $5,500,000 in excess of defendants' original investment. McFarland was to receive 25% of the amount by which any resale price he obtainedexceeded a sum which would yield defendants a profit of $1,500,000 on the original investment.
 
 
 
 22
 LEONARD P. MOORE, Circuit Judge (dissenting).
 
 
 23
 The majority in my opinion sustains the granting of a wholly unwarranted extension of plaintiffs' rights under the contract before us. The effect of this holding is to convert what was originally an almost negligible right into a far more substantial possibility. This is accomplished by judicial insertion of a novel provision into a contract between private parties, namely, that plaintiffs are entitled to a 39-month period to secure a buyer for these properties during which their rights would be free from all ambiguities.[1] Far from putting an end to the litigation in this matter, I fear the result will lead only to further court entanglements as plaintiffs seek to lengthen the period over which they can exercise their rights.
 
 
 24
 The time extension is justified by the majority on the ground that to "permit a deduction of the period consumed by litigation concerning the substance of plaintiffs' rights from the time allowed for the exercise of the rights would be to place all the risks of the conceded contractual ambiguities upon the plaintiffs' shoulders." What the majority fails to recognize is that to permit the time extension not only relieves plaintiffs of the risks arising out of the ambiguous nature of the contract, but operates to transfer the burdens onto the shoulders of defendants. The nature of the contract is such that plaintiffs have everything to gain by the passage of time and defendants much to lose.
 
 
 25
 In summary, the contract provides that plaintiffs are to share in the profits of a sale of either the stock and debentures of Arlington or one or all of the apartment buildings owned by Arlington's subsidiaries.[2] Defendants are obligated to sell[3] only if plaintiffs can find a buyer (1) willing to pay a price for the Arlington stock and debentures that would yield a profit to defendants of $5,500,000 or (2) willing to purchase one of the apartment buildings at a resulting profit of $1,375,000.[4] However, under Paragraphs 7 and 9 of the Memorandum Agreement, the underlying figure to which these profit margins must be added is, in part, geared to the principal outstanding on the mortgage indebtedness which had been reduced between July 15, 1960 and June 30, 1962 by $1,241,259 and which continues to be reduced at the rate of $364,028 per year. Furthermore, with the passage of time there is the possibility that this property will increase in value in the real estate market, perhaps to a point where the minimum offer which plaintiffs would have to obtain becomes a real possibility rather than merely a "long chance." Thus, in no sense does the time extension restore plaintiffs to "the status quo ante" but rather substantially increases the value of their rights under the contract.
 
 
 26
 The primary difficulty here is that time is of the essence in this contract. As a result, any dispute involving an ambiguity in the agreement operates to plaintiffs' disadvantage and any extension of the time for performance operates to the disadvantage of defendants. There is no middle ground; one party must suffer injury as a result of the disagreement. Under these circumstances, it is entirely inequitable to grant one party relief without considering whether his conduct is deserving of such consideration. If blame cannot be placed on either party, the only recourse left open to the court is to rule in favor of the party whose interpretation has been found to be the proper one. The district court made no determination here as to which party was at fault. The majority pays lip service to the district court in this regard, but also states that it was the "defendants [who] again erected an obstacle to the exercise by McFarland of his rights." A review of events following the original decree of the district court and the results of this second proceeding justifies the conclusion that plaintiffs, not defendants, should bear the responsibility for the creation of any obstacles that may be barring their way.
 
 
 27
 Following the filing of the original decree, the parties engaged in lengthy correspondence in an attempt to devise a procedure that would enable plaintiffs to receive all the information that they felt was necessary before they could proceed to find a buyer. A conference was arranged for January 25, 1962 at the Arlington Towers but prior to that meeting defendants' counsel received a lengthy letter from McFarland incorporating his "demands" for certain information and actions on the part of the defendants. Thereafter, negotiations broke down and defendants, rather than continue in a state of confusion as to plaintiffs' rights, petitioned the district court for a clarification of their obligations under the contract.
 
 
 28
 As the majority recognizes, in these supplemental proceedings, the district judge accepted almost all of defendants' interpretations of the contract and rejected those put forth by plaintiffs. No finding was made by the district court that plaintiffs' contentions were made in good faith; the court's wholesale rejection of them tends to indicate the contrary. I find it difficult to understand why these circumstances are thought sufficient to justify relief to plaintiffs which grants them amplification of rights already having once been enlarged and to deny to defendants the right to stand on a proper construction of the agreement without being in danger of seeing the contract both parties signed in 1957 entirely emasculated.
 
 
 29
 Unfortunately, there is already an indication that we have not seen the end of this matter. On oral argument, there was an intimation that the tax opinion which the district court ordered defendants to prepare and which has already been furnished was not entirely satisfactory. Therefore, we are faced with the likelihood that further litigation will ensue, and with the rationale of the majority, further extensions of time will be granted. This is the result of the granting of specific enforcement of a contract in violation of one of the prerequisites to judicial use of that power, namely, the requirement that the contract be sufficiently precise so that there is no basis for a misunderstanding as to the obligations of either party. See Dalzell v. Dueber Watch-Case Manufacturing Co., 149 U.S. 315, 13 S.Ct. 886, 37 L.Ed. 749 (1893); Bethlehem Engineering Export Co. v. Christie, 105 F.2d 933, 125 A.L.R. 1441 (2d Cir., 1939); Crowell v. Gould, 68 App.D.C. 297, 96 F.2d 569 (1938); Restatement, Contracts, § 370 (1932 ed.). Since no appeal was taken from the original decree, there is little that we can do about that decree. However, I see no reason why we should now compound the error. Certainly no further time extensions are warranted until such time as the plaintiffs can demonstrate that affirmative actions by defendants are making it impossible for them to secure a buyer.
 
 
 30
 I would reverse.
 
 
 
 Notes:
 
 
 [1]
 Neither the district court nor the majority here are entirely consistent in this respect for the extension of time is for a period commencing on March 2, 1962, the date on which defendants filed their motion for supplemental relief at the foot of the decree. The court fails to explain why the initiation of this litigation to resolve a dispute over certain ambiguities which existed from the time the original decree was filed is of any independent significance
 
 
 [2]
 The relevant provisions of the Memorandum Agreement are:
 "7. If at any time within thirty-nine (39) months from the date hereof the Gregory Group shall assign, transfer or sell all of the stock and debentures of Arlington at a price which produces a net profit of more than $1,500,000.00 above the investment of the Gregory Group, then McFarland shall be entitled to twenty-five (25%) percent of such net profit as is realized by the Gregory Group in connection with such sale, assignment or transfer of such stock and debentures (but only to the extent aforesaid that the net profit realized exceeds $1,500,000.00) The net profit on such sale shall mean the excess of the total sales price to be received by the Gregory Group for such stock and debentures over and above the amount paid by the Gregory Group in respect of the purchase of the stock and debentures of Arlington. The participation of McFarland in such net profits on a sale as aforesaid shall be payable as moneys are received on the down payment or other payments on the sale price from time to time, but only after there has first been repaid to the Gregory Group the amount paid in their purchase of the stock and debentures of Arlington, together with the payment of the sum of $1,500,000.00.
 "8. The parties hereto agree that the Gregory Group shall only have the obligation to make a sale to a purchaser under paragraph 7 if:
 "(a) The price at which all of the stock and debentures of Arlington are proposed to be sold will produce a net profit of not less than Four Million Dollars ($4,000,000.00) above the amount of profit prescribed in paragraph 7; and
 "(b) There is tendered to the Gregory Group, as evidence of the bona fide character of the proposed sale of stock (as aforesaid), a contract by responsible purchasers under which they agree to purchase the stock at a price not less than the amounts hereinabove set forth, which contract shall be accompanied by a certified or cashier's check as a deposit in an amount equal to 25% of the sales price, and with a firm commitment to pay the balance in cash within 45 days, and without any unusual or special conditions on the obligation to purchase or otherwise. Provided, however, that the Gregory Group shall be relieved and released of any and all further obligation to make any sale of Arlington stock or debentures or the property of Subsidiaries under paragraphs 7, 8 or 9 hereof if, within 30 days after the tender of a contract of sale which fully meets the above requirements (accompanied by a certified or cashier's check, as aforesaid) the Gregory Group shall elect to make a payment to McFarland of an amount equal to the 25% participation in profits that McFarland would have realized on the sale (above the profit of $1,500,000 prescribed in paragraph 7 hereof in which McFarland has no participation) pursuant to the contract of sale as aforesaid."
 * * * * *
 "9. The parties hereto agree that during the period of 39 months from the date hereof each Subsidiary respectively shall be prepared to sell the apartment building which it owns, together with its interest on the 99-year leasehold to it as lessee (excluding, however the sale of the shopping center or any of the stores or commercial facilities comprising same), but only in the event of compliance with all of the following:
 "(a) The sale price will produce a net profit of $1,375,000 above the following:
 "(1) An amount representing 25% of the investment by the Gregory Group for stock and debentures of Arlington, plus
 "(2) An amount representing the outstanding indebtedness of the Subsidiary involved on its FHA-insured mortgage to the extent applicable to the building sold by the Subsidiary; and
 "(b) There is tendered to the Gregory Group, as evidence of the bona fide character of the proposed sale of the apartment building, as aforesaid, a contract by responsible purchasers under which they agree to purchase the apartment building (in an `as is' condition) at a price not less than the amount hereinabove set forth, which contract shall be accompanied by a certified or cashier's check as a deposit in an amount equal to 25% of the sales price and with a firm commitment to pay the balance in cash within 45 days; and which contract shall not have any unusual or special conditions on the obligation to purchase or otherwise or a proposed use of the building which would adversely affect the value of the remainder of the project as first class residential apartments.
 "(c) Notwithstanding any other provision to the contrary, no sale shall be required of any building hereunder unless it has been determined to the satisfaction of the Counsel of the Gregory Group that profits realized in connection with the sale would, upon distribution thereof to the individual stockholders of Arlington, be taxable to them under the Federal Internal Revenue Code as capital gain and not as ordinary income. Provided, however, that the approval of the Gregory Group, Arlington and Subsidiaries respectively shall be required with respect to the order or sequence in which the individual buildings shall be sold or offered for sale and McFarland agrees to comply with the determination with respect to such order or sequence of sales."
 
 
 [3]
 If plaintiffs find a buyer who is willing to pay the required price, the defendants can elect under Paragraph 8 to refuse to make the sale and instead pay plaintiffs an amount equal to what plaintiffs would have received had a sale been consummated
 
 
 [4]
 The district court took the position in an opinion filed after the first litigation that in view of the inflated prices which would have to be paid by a prospective buyer, the plaintiffs' right to receive a share of the profits represented only a "long chance."