363 F.2d 857
 Walter P. McFARLAND, Edward P. Johnson and John Loughran, Plaintiffs-Appellees,
v.
George S. GREGORY, Alexander Westreich, N.V. Handelmaatschappij Antilia, Sol Drescher and Louis Rosenberg, Defendants-Appellants.
 No. 394.
 No. 395.
 Docket 30315.
 Docket 30316.
 United States Court of Appeals Second Circuit.
 Argued May 26, 1966.
 Decided June 10, 1966.
 
 William Rand, Coudert Brothers, New York City, Alexis C. Coudert, New York City, of counsel, for defendants-appellants.
 Arthur S. Friedman, Tanner & Friedman, New York City, and Williams, Wadden & Stein, Washington, D. C., for plaintiffs-appellees.
 Before FRIENDLY, HAYS and FEINBERG, Circuit Judges.
 PER CURIAM:
 
 
 1
 This bitterly contested controversy, in litigation since 1957, comes to us for what we trust will be the last time. Although the factual background is stated in Judge Waterman's opinion when the case was previously here, see McFarland v. Gregory, 322 F.2d 737 (2 Cir. 1963), and in Judge Dimock's opinion leading to the order under appeal, three provisions of the Memorandum Agreement of April 15, 1957, referred to in our previous opinion, 322 F.2d at 738, must be summarized. Paragraph 7 provided that if within a fixed period the Gregory Group should sell all the stock and debentures of Arlington Towers Land Corporation for a net profit of more than $1,500,000 over their investment, McFarland should receive 25% of the excess. Paragraph 8 provided that the Gregory Group was required to sell under paragraph 7 only if the price would provide a profit of $5,500,000. Paragraph 9 provided that, during the same period fixed in paragraph 7, each of Arlington's four subsidiaries "shall be prepared to sell the apartment building which it owns, together with its interest on the 99-year leasehold to it as lessee" if the price would produce a net profit of $1,375,000 in excess of 25% of the Gregory Group's investment plus the subsidiary's mortgage indebtedness. Finally, returning to paragraph 8, we find a provision that if within 30 days after a tender complying with that paragraph, the Gregory Group elected to pay McFarland his share of what would have been the profit under the tender, the Gregory Group "shall be relieved and released of any and all further obligation to make any sale of Arlington stock or debentures or the property of Subsidiaries under paragraphs 7, 8 or 9 hereof."
 
 
 2
 After proceedings in the District Court following on our previous decision, wherein McFarland sought reconveyance of the stock and debentures on the ground that the defendants, the Gregory Group, were contemptuously endeavoring to block him from acquiring the leaseholds, and efforts to reach a settlement aborted, defendants' then attorneys stipulated that if McFarland made a tender for the four leaseholds in specified amounts aggregating $19,900,088 by August 16, 1965, the defendants would "accept the same as a tender complying with and having only the consequences of one which complies with Paragraph 9 of the Memorandum Agreement." The $19,900,088 price was calculated to yield defendants precisely the minimum required by paragraph 9. McFarland made such a tender on August 12, 1965, and in accordance with the stipulation the subsidiaries executed contracts of sale which were closed on August 30 and 31. McFarland next made a tender of $5,500,000 under paragraph 8 for the securities of Arlington; defendants elected to pay him $1,000,000 and keep these. They then moved at the foot of the previous judgments to require McFarland to pay an additional $3,500,000 for the leaseholds on the basis that he was bound to obtain their fair market value and that his ability to obtain an $18,000,000 first mortgage from the Equitable Life Assurance Society, allegedly unknown to defendants until the closing, indicated a market value of at least $23,400,000. Judge Dimock denied the motion with an opinion, and defendants appeal.
 
 
 3
 It is indeed somewhat difficult to understand the business sense of a contract which protected the Gregory Group from an attempt by McFarland under paragraph 8 to make a bargain purchase of the stock and debentures by permitting Gregory to retain the securities upon paying him an amount equal to 25% of the profits exceeding $1,500,000, but afforded no such protection against his proceeding under paragraph 9 to obtain the corporation's most valuable assets by tendering the minimum price, while still being able to force the Gregory Group either to sell him the securities for a price yielding the same profit or buy him off. Perhaps, if we were starting afresh, a case could be made that, despite the language, paragraph 9 was not intended as a vehicle for McFarland's purchasing for himself but was meant only to protect him against the Gregory Group's gambling at his expense if he produced an outsider willing to buy one or more of the leaseholds but not the securities. However, it would be far too late for the defendants to urge this interpretation. They have never questioned that McFarland could purchase any or all of the leases seriatim or at once; indeed, the bickerings over the last four years have proceeded on the assumption that he probably would buy them all. Defendants did contend in earlier proceedings in the district court that they could refuse a tender under paragraph 9 on the same basis as under paragraph 8, but the court ruled against this construction in 1962 and they took no appeal. Instead they sought the lesser relief of a provision in the judgment that once a tender was made under paragraph 9, they could defeat it with a higher one; this too the court refused. Finally, the stipulation of previous counsel evidenced defendants' construction of the contract as permitting McFarland to acquire the leases at the minimum prices set forth in paragraph 9.
 
 
 4
 We perceive no basis whereby, after all this history, a court could impose on McFarland a duty to bid more. If ever parties have dealt at arms' length — indeed at swords' point, these have. It should have been clear to the Gregory Group since the 1962 judgment that the only way to prevent McFarland's taking advantage of paragraph 9 to acquire the leaseholds for the minimum price was to beat him to the draw by finding someone who would bid more. Having failed to do this, having stipulated to accept the minimum price, and having closed with full knowledge of the facts, they are in no position to invoke the aid of equity to improve their bargain.
 
 
 5
 Affirmed.