Walter P. McFARLAND, Edward P. Johnson and John Loughran, Plaintiffs-Appellants-Appellees,

v.

George S. GREGORY, Alexander Westreich, N. V. Handelmaatschappij Antilia, Sol Drescher and Louis Rosenberg, Defendants-Appellees-Appellants.

No. 220, Docket 30781.

United States Court of Appeals Second Circuit.

Argued Dec. 2, 1966.

Decided Feb. 24, 1967.

See also, 2 Cir., 363 F.2d 857; 322 F.2d 737.

Arthur S. Friedman, New York City, (Tanner & Friedman, New York City, and Williams, Wadden & Stein, Washington, D. C., on the brief), for plaintiffs-appellants-appellees.

Simon H. Rifkind, New York City, (William Rand, Gerald D. Stern, Stephen Sayre Singer, Coudert Brothers, New York City, on the brief), for defendants-appellees-appellants.

Before LUMBARD, Chief Judge, and FRIENDLY and HAYS, Circuit Judges.

LUMBARD, Chief Judge.

Plaintiffs (the McFarland Group) and defendants (the Gregory Group) cross-appeal from two judgments of Judge Dimock in the Southern District of New York, entered February 25 and June 30, 1966, which (1) granted the McFarland Group a refund of $700,088 of the purchase price of four apartment buildings and leaseholds, (2) denied it the balance of approximately $450,000 in the "replacement funds" for the buildings, and

(3) granted it $189,996.40 of the proceeds of the condemnation of a tract called "C Ground," but denied its claim for an additional $148,000 of the proceeds. As this is the third appeal in a litigation which has lasted almost a decade, a brief account of the underlying transaction and the course of the litigation is essential to an understanding of the parties' contentions.

The McFarland Group developed Arlington Towers in Arlington, Virginia, a project completed in 1955, covering eighteen acres, and consisting of a shopping center and four apartment buildings, each containing over 400 apartments. The land was owned by Arlington Towers Land Corporation (Arlington), whose stock and debentures were held by the McFarland Group, and parcels were leased for 99 years to four wholly-owned subsidiaries of Arlington, each of which constructed and owned one of the apartment buildings.

In 1957, after unsuccessful litigation with the builder of Arlington Towers, see Arlington Towers Land Corp. v. John McShain, Inc., 150 F.Supp. 904 (D.D.C. 1957), Arlington entered into a consent judgment binding it to pay the builder $750,000 immediately and $1,181,589.46 with interest over 39 months. The McFarland Group financed the $750,000 payment by selling the stock and debentures of Arlington to a third party, reserving only a one-year call right. On April 15, 1957, the McFarland Group sold this call right to the Gregory Group for $250,000, and the Gregory Group exercised the call in June 1957 for $1,339,000.

By a Memorandum Agreement between the McFarland and Gregory Groups, also executed April 15, 1957, certain rights were reserved to the McFarland Group for 39 months. Paragraph 7 of the Memorandum Agreement [1] provided that if the stock and debentures of Arlington were sold by the Gregory Group during that period, the McFarland Group should receive 25% of the excess over $1,500,000 of the "net profit * * * above the investment of the Gregory Group" in the stock and debentures of Arlington. Paragraph 8 obliged the Gregory Group to make a sale under paragraph 7 only if the net profit would exceed $5,500,000 and a responsible purchaser's contract were tendered with a 25% deposit, and relieved it "of any and all further obligation to make any sale of Arlington stock or debentures or the property of Subsidiaries under paragraphs 7, 8 or 9" if it elected instead of selling to pay the McFarland Group its paragraph 7 participation in the potential profit. Finally, paragraph 9 required each subsidiary to sell its apartment building and 99-year leasehold (excluding the shopping center and appurtenant portions of leaseholds) at a price producing a net profit of $1,375,000 over one-quarter of the Gregory Group's investment plus the subsidiary's outstanding indebtedness on its FHA-insured mortgage, upon tender of a responsible purchaser's contract to purchase the building "as is" and a 25% deposit, if the Gregory Group's counsel were satisfied that the proceeds when distributed would be taxable as capital gain to Arlington's individual stockholders.

On July 25, 1957, the Gregory Group asserted that the McFarland Group had warranted a number of liabilities and costs to be less than they were, and gave notice that until the alleged warranties were made good it would withhold "fulfillment of any rights upon the part of McFarland under said agreement." The McFarland Group brought this diversity action in the Southern District of New York on September 13, 1957, seeking rescission of the transaction because of the Gregory Group's failure to perform.

After a trial in 1960 and 1961, Judge Dimock found that the McFarland Group neither warranted nor knowingly misrepresented liabilities or costs. Accordingly, although he held that the Gregory Group had refused performance in good

---

1. Paragraphs 7, 8, and 9 of the Memorandum Agreement are set forth in McFarland v. Gregory, 322 F.2d 737, 741–742 n. 2 (2 Cir. 1963).

faith, Judge Dimock rendered a decree of specific performance extending the McFarland Group's rights under paragraphs 7, 8, and 9 of the Memorandum Agreement for three years from the date of his opinion, approximately the period remaining of the original 39 months when the Gregory Group refused to perform. This extension was conditioned upon addition to "the investment of the Gregory Group," as a component of the formula prices under paragraphs 7, 8, and 9, of the consolidated net profits of Arlington and its subsidiaries beginning with the fiscal year starting July 1, 1960 (approximately the original expiration date of the McFarland Group's rights), less federal income taxes paid, and less dividends distributed to stockholders of Arlington "for each full fiscal year of said Corporation from July 1, 1960 to the June 30 preceding" a paragraph 7 sale or a paragraph 8 or 9 tender. Neither party appealed the 1961 decree.

In 1962 both parties raised questions concerning the implementation of paragraph 9, on which Judge Dimock ruled in a supplemental decree. He held that the Gregory Group could not elect not to convey an apartment building under paragraph 9 as it could the stock and debentures of Arlington under paragraph 8 and that the formula price under paragraph 9 did not include the prepayment penalty on each subsidiary's FHA-insured mortgage.[2] The supplemental decree further extended the McFarland Group's rights under paragraphs 7, 8, and 9. The Gregory Group appealed only the second extension of time, and this Court upheld it. McFarland v. Gregory, 322 F.2d 737 (2 Cir. 1963).

In February 1965 the McFarland Group again moved before Judge Dimock for rescission of the underlying transaction, claiming that the Gregory Group had clearly shown that it would not perform under paragraph 9. This motion was argued in April 1965 and led to settlement talks, which aborted on July 30,

1965. The McFarland Group immediately moved to compel the Gregory Group to accept a tender in a specified form for all four apartment buildings under paragraph 9. The Gregory Group interposed three objections to the tender: First, the tender credited the McFarland Group with $1,000,000, its potential profit participation on a sale of Arlington at the formula price under paragraph 8. Second, it called for immediate conveyance of the property, whereas the Gregory Group sought a 25% deposit and a month or more to convey, since section 337(c) of the Internal Revenue Code of 1954, 26 U.S.C. § 337(c), required that Arlington be dissolved before the subsidiaries received the sale price if recognition of gain by the subsidiaries was to be avoided under section 337. Finally, the tender provided that the Gregory Group should subordinate or satisfy a mortgage on the fee.

These differences were compromised in three days of argument and negotiation before Judge Dimock in early August. The McFarland Group agreed to tender the formula price computed by the Gregory Group, $19,899,870, without the $1,000,000 credit, but specifically stated that it did not intend to "give up the rights that we have retained under the contract or under the judgments." Although Judge Dimock ruled that the Memorandum Agreement did not require that the subsidiaries be assured nonrecognition of gain, the McFarland Group also consented to the liquidation of Arlington, but reserved its paragraph 7 and 8 rights for a limited time as though Arlington had not been liquidated. The Gregory Group agreed to accept a deposit of $500,000, and to subordinate or satisfy the mortgage on the fee. The parties finally stipulated, in language suggested by Judge Dimock, that they would accept the tender agreed on "as one which complies with and one having only the consequences of one which complies with paragraph 9."

2. After proceedings that figure in the companion appeal, Docket No. 30845, the parties agreed on an apportionment of the mortgage debts and leaseholds between the shopping center and the apartment buildings.

When the paragraph 9 purchase by the McFarland Group was consummated on August 31, 1965, the Gregory Group found that the McFarland Group had obtained two mortgages on the buildings and leaseholds for a total amount exceeding the price paid. It then claimed that the Memorandum Agreement required the McFarland Group to pay the fair market value of the buildings and leaseholds, but this contention was unsuccessful both before Judge Dimock and in this Court. McFarland v. Gregory, 363 F.2d 857 (2 Cir. 1966).

The McFarland Group then bid for the assets of Arlington at the formula price under paragraph 8. Instead of selling, the Gregory Group elected to pay the McFarland Group its participation in the potential profit, $1,000,000.

At this point the McFarland Group advanced the three claims whose disposition by Judge Dimock on February 25 and June 30, 1966 is the subject of the present appeal.

## I.

The McFarland Group first sought a refund of $700,088 of the price paid under paragraph 9, representing the profits after taxes of Arlington and its subsidiaries from July 1, 1960 to June 30, 1964. Since Arlington never declared a dividend, the Gregory Group claimed and received this sum as part of its "investment," and thus of the paragraph 9 formula price under the 1961 decree.[3] Judge Dimock awarded the $700,088 to the McFarland Group, but we reverse his decision.

The McFarland Group argued before Judge Dimock that undistributed after-tax profits of Arlington and its subsidiaries should be included in the Gregory Group's investment only under paragraphs 7 and 8, since a purchaser of Arlington's stock or debentures under those paragraphs would obtain the profits, but not under paragraph 9, since a purchaser of the buildings and leaseholds would not.[4] The 1961 decree, however, added the profits to the Gregory Group's investment for purposes of paragraphs 7, 8, *and* 9, and was not appealed. As Judge Dimock ruled, the McFarland Group cannot seek to amend the decree now.

Judge Dimock held, however, that the $700,088 was actually distributed as a "dividend" within the meaning of the 1961 decree, since Arlington was liquidated after the tender under paragraph 9 but before the closing, and the subsidiaries, whose stock was now held by the Gregory Group, adopted plans for complete liquidation and had to distribute their assets within twelve months to avoid recognition of gain by the subsidiaries under section 337 of the Internal Revenue Code, 26 U.S.C. § 337. He stated that the "intention" of the 1961 decree was

> that the Gregory Group should get by way of sale price all of the earnings of those designated years except as paid to the Gregory Group by way of dividends. There is nothing in the language of the decree that indicates that the dividends must be paid before the tender or before the sale or at any fixed time.

The Gregory Group urges, apparently for the first time on appeal, that the August 1965 proceedings before Judge Dimock leading to the paragraph 9 tender constituted a settlement, as part of

---

3. Profits for the fiscal year ending June 30, 1965 were excluded from the price paid by stipulation of the parties.

4. The Gregory Group counters that a paragraph 9 purchaser would in effect obtain the subsidiaries' undistributed profits in the form of improvements to the buildings and leaseholds, or of amortization of the FHA-insured mortgages. It presented no evidence that such improvements were made during 1960–1964, and its amortization contention fails to deal with the fact that a paragraph 7 or 8 purchaser within the original 39 months would have obtained the benefits of amortization as well as any undistributed after-tax profits. Especially since Judge Dimock has not passed on these arguments, we find them at best inconclusive in determining whether the $700,088 profits should have been awarded to the McFarland Group.

which the McFarland Group waived the right to seek a refund of any part of the tender price. The transcript of the proceedings shows, however, that the Mc-Farland Group repeatedly stressed its intention not to waive any right to a refund, and that the final stipulation framed by Judge Dimock was meant to make this intention clear. The Gregory Group also suggested during the August 1965 proceedings that the paragraph 9 tender would bar any later claim for a refund as a matter of law, but this suggestion has not been renewed.

█ It is next contended that the Mc-Farland Group is estopped to seek a refund of the $700,088 profits by its paragraph 8 tender for the assets of Arlington. The Gregory Group argues that it might well not have elected to forestall a sale by paying the McFarland Group its $1,000,000 profit participation had it known that a refund application would be made. But a refund of the $700,088 would reduce the paragraph 8 formula price *pari passu* with the assets covered by paragraph 8, so that the Gregory Group's decision to sell or to pay the profit participation could not be affected. The Gregory Group has not attempted to show, in fact, that its decision to pay the profit participation was actually made in reliance upon any representations by the McFarland Group. The lack of this showing is fatal to its claim of estoppel.[5]

█ The Gregory Group's final contention, with which we agree, is that Judge Dimock's construction of his 1961 decree was wrong. We think it clear that the liquidations of Arlington and its subsidiaries did not constitute a "dividend" within the meaning of the 1961 decree. Under the stipulation of the parties pursuant to which Arlington was liquidated, the McFarland Group's paragraph 7 and 8 rights were preserved for a limited time (within which the paragraph 8 tender was made) as though no

liquidation had occurred. A paragraph 7 or 8 purchaser would therefore have obtained the profits despite Arlington's liquidation; they should thus be retained in the Gregory Group's investment for purposes of paragraphs 7 and 8, and accordingly of paragraph 9.

Practical considerations lead to the same conclusion. The record does not suggest any other purpose for the liquidations than insuring nonrecognition of gain by the subsidiaries. In particular, there is no indication that the Gregory Group intended to extract any of Arlington's assets or to abandon any part of its operations. Neither the Memorandum Agreement nor the 1961 decree should be construed to attach sweeping nontax consequences to such exclusively tax-motivated liquidations.

We do not feel that our holding rests too heavily upon the form of the stipulation pursuant to which Arlington was liquidated. It is true that the inclusion of the $700,088 in the assets covered by paragraph 8 had no practical significance under that paragraph, as it was balanced by its inclusion in the formula price. It is also true that Judge Dimock ruled before the stipulation was made that the Memorandum Agreement did not require that the subsidiaries receive nonrecognition treatment. It is thus conceivable that the McFarland Group did not foresee the loss of its present dividend argument, and that it would not have entered into the stipulation if it had. However, even if the McFarland Group had not agreed that paragraphs 7 and 8 would continue to apply as though Arlington had not been liquidated, it is more than likely that this result would have been reached by interpretation of the Memorandum Agreement and the 1961 decree. Moreover, it is also possible that the Gregory Group would have appealed Judge Dimock's ruling or withdrawn its prior concessions had the stipulation been

5. The Gregory Group also urges that the provision of paragraph 8 that payment of the profit participation relieved it "of any and all further obligation to make any sale of Arlington stock or debentures or the property of Subsidiaries under paragraphs 7, 8 or 9" bars any refund. This provision quite clearly relates to future transactions under paragraph 9, not to adjustment of past transactions.

refused. We therefore have no hesitation in giving effect to the stipulation, reached as it was after extensive negotiation between experienced counsel.[6]

For these reasons, we reverse Judge Dimock's award of the $700,088 profits as a refund to the McFarland Group.

## II.

■ The McFarland Group's second claim was for the balance remaining in the subsidiaries' "replacement funds" at the time of the paragraph 9 closing. Each subsidiary was required by its FHA-insured mortgage to make monthly contributions to a replacement fund controlled by its mortgagee, to be used solely to insure necessary replacement of equipment in its apartment building. When the mortgages were satisfied at the paragraph 9 closing, the balance of approximately $450,000 in the funds was paid to the subsidiaries. The McFarland Group argued that it would bear the cost of the replacement for which the funds were to provide, and should receive the balance. Judge Dimock rejected this claim, and we affirm his decision.

The McFarland Group first contends that since the Memorandum Agreement requires a paragraph 9 buyer to take the apartment buildings "as is," it implies that he should receive the balance of the replacement funds. Otherwise, it argues, the Gregory Group would be tempted to forego normal replacement and let the buildings run down if it anticipated a paragraph 9 sale. The McFarland Group did not attempt to prove that normal replacement had in fact been neglected. The sizable balance in the replacement funds is equally explainable by the fact that contributions to a replacement reserve normally exceed expenditures for replacement during the first years of operation of a property. Both parties were fully aware of this

fact when the Memorandum Agreement was drafted. We think that Judge Dimock was right, therefore, in holding that an obligation to convey the replacement funds cannot be implied under paragraph 9, which nowhere mentions them. We assume that if neglect can be proved, the McFarland Group will assert a claim for this in the further proceedings now being held before Judge Dimock; we intimate nothing as to the validity of such a claim.

The McFarland Group alternatively urges that the replacement funds when received by the subsidiaries constituted a "dividend" to the Gregory Group within the meaning of the 1961 decree. Judge Dimock rejected this contention only because he had already awarded a refund of $700,088 which fully exhausted the after-tax profits of Arlington and its subsidiaries from July 1, 1960 to June 30, 1964. We reject it because, as we have held in reversing the $700,088 award, we do not think that the liquidation of Arlington and its subsidiaries resulted in a "dividend" within the meaning of the 1961 decree.

We therefore affirm Judge Dimock's determination that the McFarland Group is not entitled to the replacement funds.

## III.

■ The McFarland Group's third demand was for 50% of the net proceeds of $675,992.80 from the condemnation by the Commonwealth of Virginia of a tract of somewhat less than an acre that the parties call "C Ground," across a street from the Arlington Towers project. Paragraph 6 of the Memorandum Agreement recited that C Ground was subject to a lien of the builder of Arlington Towers for $296,000, which could be removed by prepayment of that amount of the consent judgment. It then provided that the McFarland Group should re-

---

6. The McFarland Group also relies on a provision of the 1962 supplemental decree that the use of profit and dividend figures furnished by the Gregory Group in calculating the paragraph 9 tender price should not prejudice its right to a refund "in the event such amounts are later determined to be incorrect." Our holding implies, however, that the figures supplied by the Gregory Group were not incorrect.

ceive 50% of the sale price "realized by the Gregory Group" in excess of $296,000 if C Ground were sold, or 50% of all "surplus cash" (as defined) after the Gregory Group was "repaid" $296,000 plus "any other money invested or guaranteed by the Gregory Group" if C Ground were developed by the Gregory Group. McFarland's uncontradicted testimony at the 1960–1961 trial shows that when the Memorandum Agreement was drawn up he and Gregory were discussing the sale or commercial development of C Ground. In fact, it was not developed; the builder's consent judgment was paid and the lien thus removed in the normal course by Arlington, and C Ground remained unimproved when taken by the commonwealth in 1964.

Judge Dimock held that the McFarland Group was entitled to 50% of the net proceeds over $296,000, or $189,996.40. The Gregory Group argues that the McFarland Group should receive none of the C Ground proceeds, and the McFarland Group contends that it should also receive 50% of the first $296,000. We uphold the latter contention.

The Gregory Group's main argument is that paragraph 6, which provided that the McFarland Group should share in any sale proceeds of C Ground "realized by the Gregory Group," was inapplicable because C Ground when condemned was owned by Arlington, not directly by the Gregory Group. However, after the first four paragraphs, which deal with the transfer of control of Arlington to the Gregory Group, the Memorandum Agreement refers generally to "the Gregory Group," rather than specifically to Arlington, its stockholders, and its subsidiaries. For example, paragraph 9(b) requires a paragraph 9 tender to be made to "the Gregory Group."

Moreover, C Ground was owned by Arlington at the time the Memorandum Agreement was executed, when both groups contemplated quick development of the property, so that paragraph 6 would have been almost meaningless if it did not apply to sale or development by Arlington. The Gregory Group argues that paragraph 6 was meant to assure the McFarland Group participation in C Ground proceeds if C Ground were transferred out of Arlington. This argument, however, assumes that the Gregory Group was otherwise free to terminate its obligations under the Memorandum Agreement by removing property from Arlington, which is more than doubtful. The Gregory Group's construction of paragraph 6 thus fails to account convincingly for its inclusion.

Moreover, its construction assumes that the McFarland Group's paragraph 7 and 8 rights were adequate substitutes for its paragraph 6 rights if Arlington retained C Ground. We cannot agree. The paragraph 7 and 8 rights lasted only 39 months, while the paragraph 6 rights had no time limit. There might well have been a sale of C Ground without any sale of Arlington (in fact, the condemnation of C Ground preceded the paragraph 8 tender by over a year). Even if both were sold, there might well have been a profit on the sale of C Ground but not one greater than $1,500,000 on the sale of Arlington as a whole.

The Gregory Group finally urges that the McFarland Group is estopped by its paragraph 8 tender to seek any part of the C Ground proceeds. We reject this contention, as we rejected a similar one in part I of this opinion.

The McFarland Group contends that $296,000 was to be deducted from the sale proceeds of C Ground before its 50% participation only if the Gregory Group had to pay that amount to remove it from the builder's lien. The language of the Memorandum Agreement and the circumstances under which it was executed lead us to agree. The parties clearly contemplated that C Ground would be sold or developed well within the 39-month duration of the builder's lien. Paragraph 6 refers specifically to the lien, to no apparent purpose unless the McFarland Group's construction is adopted, and at one point speaks of the Gregory Group being "repaid" an investment of $296,000. Moreover, the McFarland Group's construction accords with the general

pattern established by paragraphs 7, 8, and 9, which define the McFarland Group's profit participations by reference to amounts actually invested by the Gregory Group. As the parties' intention that the $296,000 should be deducted only if advanced by the Gregory Group is so clear, it should be followed even though it was not made express in the Memorandum Agreement.[7]

Thus we reverse Judge Dimock's award of $700,088 to the McFarland Group, affirm his refusal to award it the replacement funds, and modify his award to it of $189,996.40 of the C Ground proceeds by awarding it an additional $148,000.

---

7. The Gregory Group argued before Judge Dimock, but not on this appeal, that the capital gain taxes paid by Arlington on the C Ground proceeds should be allocated between its share and the McFarland Group's. We question, as did Judge Dimock, the premise that Arlington will be liable for taxes on the McFarland Group's share. Even if it will, however, none of the provisions of the Memorandum Agreement provides for or implies any allocation of taxes. Thus we do not think that any possible tax liability of the Gregory Group should lead us to reject the McFarland Group's construction of paragraph 6.