Robert P. GATEWOOD, et al.

v.

UNITED STATES CELLULAR
CORPORATION, a Delaware
Corporation, Appellant.

No. 91–7012.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 25, 1991.

Decided Jan. 17, 1992.

John B. Williams, with whom Mark L.
Austrian, Washington, D.C., was on the
brief, for appellant.

William O. Bittman, with whom Alexander P. Starr, Washington, D.C., was on the
brief, for appellees.

Before WALD, SILBERMAN, and
HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit
Judge WALD.

WALD, Circuit Judge:

Appellant United States Cellular Corporation ("USCC") challenges an order of the
district court granting specific performance
of a "put option" in an agreement between
USCC and Robert P. Gatewood, but modifying the date in the agreement by which
the "put" may be exercised and as of which
the value of Gatewood's interest will be
evaluated. We conclude that the district
court's action was not justified by law or
by the evidence before it, and reverse.

## I. BACKGROUND

In 1984, Robert Gatewood, a resident of the District of Columbia, along with two passive partners, William Schneeman and Mary Elizabeth Ewing, formed a partnership ("Gatewood") in order to participate in the Federal Communication Commission's ("FCC") cellular phone system license lottery. In February, 1986, Gatewood won the lottery and subsequently became the licensee for the Des Moines, Iowa cellular telephone system. As licensee, Gatewood was required to construct, operate, and market a new cellular telephone system, and to that end he selected USCC, a Delaware corporation with substantial experience in planning, constructing, and operating cellular telephone systems, to become a partner in the venture. FCC regulations required that Gatewood as licensee remain in control of the operation and not sell his interest until construction of the system was complete.

In December, 1986, following extensive negotiations between the parties, Gatewood and USCC entered into three separate contracts: one that detailed the purchase price for USCC's "buy in" to the enterprise (roughly $1,500,000), in exchange for which it received 40% of the shares of the partnership; a second contract that established the terms of the partners' rights to buy or sell their respective interests ("First Part-

nership Agreement" or "Agreement"); and a third that detailed USCC's obligations in designing, constructing, and operating the phone system ("Agency Agreement").[1]

The terms of the First Partnership Agreement granted USCC the right to purchase an additional 11% interest from Gatewood, on the date the system became operational or one year after the execution of the agreement ("option date"), whichever came first, at a specified price.[2] The Agreement also provided Gatewood the right "to put"[3] its remaining 49% interest in the partnership, on or after the option date, for a thirty-six-month period. Gatewood was required to include in his "put notice" the price at which he was willing to sell. If USCC did not agree to the offering price, it was required to send a written rejection notice to Gatewood. Thereafter, the parties had ten days to agree upon a price. If they were unable to agree, the price was to be determined under a specified appraisal process.[4]

The Gatewood–USCC venture encountered its share of bumps along the way; justifiably concerned about compliance with the FCC rule that he remain in control of the operation, Gatewood complained about USCC's failure to provide needed information. USCC also failed to meet some of the interim "performance goals" of the Agency Agreement, and USCC borrowed funds

---

1. Paragraph 2.1 of the Agency Agreement also contained a provision regarding Gatewood's retention of "control" as required by FCC regulations.

 Subject to the general authority of the Managing General Partner [Gatewood] of the Permittee to control the affairs of the Permittee, the Agent [USCC] shall be responsible for all duties and responsibilities relating to the successful development of the System.... All of the foregoing services shall be rendered by the Agent subject to the Approval of [Gatewood]. [USCC] understands that discretion and control over the System shall remain vested in [Gatewood], and [USCC] shall do nothing inconsistent therewith.

2. The purchase price for this additional 11% interest was set at $10.56 per population unit. "Per population unit" is the standard measuring the value of cellular telephone systems; the $10.56 is multiplied by the population of the market in question to arrive at the total sale price.

3. The specific terms governing Gatewood's "put" rights are set forth in Paragraph 8.7(a) of the First Partnership Agreement:

 Any of the limited partners in the partnership other than USCC shall have a right, commencing on the option commencement date and ending thirty-six (36) months thereafter to send a written notice to USCC requiring USCC to purchase the limited partnership interest being offered ("the put"). The notice shall become effective thirty (30) days after the date of the notice.

4. Under the appraisal process, the effective date to determine the value of the 49% interest was set at thirty days subsequent to the date plaintiffs initially exercised their "put right." Each party was to propose an appraiser, the two parties' nominees would in turn agree upon a third appraiser.

without approval from Gatewood. Ultimately, however, USCC completed the construction, the system became operational and, more critically, turned out to be enormously profitable.[5]

Three days after operation began in September, 1987, and pursuant to the First Partnership Agreement, Gatewood notified USCC that he was exercising his right to sell his 49% interest to USCC, and proposed an offering price of $10 million. USCC rejected the offered price, and exercised its own option to purchase the 11% interest at the price stipulated in the Agreement. The parties could not subsequently agree on a purchase price for Gatewood's remaining 49%, thereby triggering the appraisal process, under which appraisers appointed by the parties would determine the fair market value of Gatewood's interest as of thirty days after Gatewood gave notice of his put, *i.e.,* October 15, 1987, became the agreed-upon valuation date for appraisal.

The Gatewood- and USCC-appointed appraisers were, however, unable to agree on the third appraiser. As a result, Gatewood filed suit on February 23, 1988, seeking to enforce the contract and begin the appraisal process. In March of 1988, Gatewood received an offer from Roanoke Valley Cellular to sell the entire Des Moines system to it for $17.5 million; the Roanoke offer was significantly higher than earlier valuations of the system. Shortly thereafter, on March 29, 1988, Gatewood changed his litigation strategy and filed an amended complaint, asking for rescission of all the Agreements on the grounds that USCC had materially breached the contract by interfering with his ability to retain control of the operation. Gatewood also refused to execute the transfer of his 11% interest to USCC. USCC in turn counterclaimed for specific performance of the Agreement, to enforce its purchase of the 11% interest at the option price and to enforce its purchase of Gatewood's 49% interest pursuant to the appraisal process set out in the Agreement.

After a fifteen-day bench trial, the district court issued a detailed order, finding that USCC had not materially breached any of the three Agreements, and thus denying Gatewood's claims for rescission. *Robert P. Gatewood v. United States Cellular Corp.,* No. 88–0477, Memorandum Opinion ("Mem. op.") at 17, 1990 WL 154286 (D.D.C. Sept. 28, 1990). Although Gatewood had "several valid complaints" about USCC's compliance with its contractual obligations in constructing the system, the court concluded that USCC had nevertheless "fundamentally accomplished the tasks set forth in the Agency Agreement." Mem. op. at 20.

Concerning USCC's deficiencies in fulfilling its contractual duties, the district court found that USCC was several months late in providing financial statements for the months of June through November, 1987. The court also found that USCC did not provide Gatewood with an approved operating budget for 1987 until several months after Gatewood had requested one. USCC also did not comply with Gatewood's request that he receive weekly reports on the construction of the system. Mem. op. at 9. The court also found that USCC borrowed money from the partnership without Gatewood's approval, and that USCC did not meet interim performance goals established in the Agency Agreement. Mem. op. at 11–12.

Despite these deficiencies in USCC's performance, the district court ultimately resolved several factual disputes in USCC's favor, finding that although USCC was often late in providing Gatewood with information about the system, USCC nonetheless did give Gatewood sufficient financial and operational data so that he could retain control of the enterprise. Based on the information he received, Gatewood approved the design and the construction of the system and all major purchase orders and expenditures. The court also concluded that there was no evidence that the FCC was concerned about Gatewood's lack of control of the enterprise. Mem. op. at 19.

---

5. The value of the company increased from an initial investment of approximately $4 million to an estimated value of $10 to $20 million upon completion of the construction. The company is now worth approximately $75 million.

Furthermore, the court found that Gatewood's absolute authority to terminate USCC as agent (because of USCC's failure to meet the interim performance goals), assured Gatewood's control over the system, Mem. op. at 19, and that USCC's allegedly unauthorized borrowing of funds had not harmed the partnership and did not amount to a material breach of the Agreement. Mem. op. at 20. The court ultimately concluded that none of USCC's breaching conduct had any material effect on the completion, competitiveness, or success of the system, Mem. op. at 20, 22, 24, although it awarded Gatewood $217,859.00 (later reduced to $130,715.40) for damages caused by USCC's conduct resulting in excess oversight costs for Gatewood.

Because the court found that USCC had substantially performed its obligations under the Agreements, it determined that "USCC has a valid right to exercise its purchase option" for the 11% interest. Mem. op. at 24. The court also granted USCC's demand for specific performance regarding the put option, and ordered completion of the appraisal process to determine the value of the 49% interest. The court's order, however, contained a modification of the terms of the Agreement. In order to reach "the most fair disposition of this matter," the court allowed Gatewood to re-exercise his put option anytime before January 12, 1991, thereby changing the agreed-upon valuation date under the appraisal process from October 15, 1987, to any pre-January date on which Gatewood chose to re-exercise his put. Mem. op. at 25. Gatewood re-exercised his put right on November 1, 1990, which under the court's order, became the new valuation date. In monetary terms, this date change increases the value of Gatewood's interest (according to his own estimates) by approximately $27 million.[6] USCC challenges only that part of the district court's order changing the valuation date.

---

**6.** The exact value of Gatewood's interest as of the original valuation date of October 15, 1987, has yet to be determined. At that time Gatewood's asking price was approximately $10 million; a price USCC rejected. Mem. op. at 12–13. Giving to Gatewood the benefit of the doubt, based on the highest offer he received several months later (the Roanoke offer in March of 1988), his 49% would have been worth approximately $8.7 million. On January 12, 1991, the last date on which Gatewood could re-exercise his put under the district court's decision, the value of the same interest would be approximately $36 million.

## II. DISCUSSION

### A. *Standard of Review*

The parties disagree on the appropriate standard for our review of the district court's decision. USCC argues that because our review does not involve any contest over factual issues, we should review *de novo* the district court's decision to change the valuation date. *See, e.g., Cuddy v. Carmen,* 762 F.2d 119, 123 (D.C.Cir.), *cert. denied,* 474 U.S. 1034, 106 S.Ct. 597, 88 L.Ed.2d 576 (1985) (legal questions reviewed *de novo*); *Horner v. Bourland,* 724 F.2d 1142, 1144 (5th Cir.1984) (review of conclusions of law plenary when factual findings not challenged). Gatewood argues on the other hand that we owe deference to the district court's broad discretion to fashion an equitable remedy and we should disturb such remedy only for an abuse of that discretion. *See, e.g., Woerner v. United States Small Business Admin.,* 934 F.2d 1277, 1279 (D.C.Cir.1991) (appellate court reviews trial court's denial of equitable relief only for abuse of discretion); *Harjo v. Andrus,* 581 F.2d 949, 952 (D.C.Cir.1978) (same). We find no basis for the district court's modification of the valuation date under either standard of appellate review.

### B. *The Law of Reformation*

 The district court found, and the parties agree, that the First Partnership Agreement is governed by Maryland law. Maryland law is clear that in the absence of fraud, accident, mistake or illegality, a court of equity cannot reform a contract or change the agreed-upon terms. *See, e.g., Maryland Port Admin. v. John W. Brawner Contracting Co.,* 303 Md. 44, 492 A.2d 281, 288 (1985); *Painter v. Delea,* 229 Md. 558, 184 A.2d 913, 916 (1962). In other words, absent these aberrations, a court

must enforce the terms of a contract if they were fair at the time the contract was entered into; it may not change the terms in the interests of achieving a "fair" result in light of later developments. *See Canaras v. Lift Truck Services, Inc.,* 272 Md. 337, 322 A.2d 866, 873 (1974) ("improper for the court to rewrite terms of a contract ... when the terms are clear and unambiguous, simply to avoid hardships"); *Hoffman v. Chapman,* 182 Md. 208, 34 A.2d 438, 440 (1943) ("equity reforms an instrument not for the purposes of relieving against a hard or oppressive bargain, but simply to enforce the actual agreement of the parties to prevent an injustice which would ensue if this were not done"). Gatewood readily concedes that none of the legal bases for reformation—fraud, accident, mistake or illegality—underlies the theory of its case.

## C. *The Law of Specific Performance*

■ Gatewood makes a different argument. He asks us to view the court's decision not as a "reformation" of the terms of the contract, but rather as an equitable remedy granting specific performance of the contract modulated in only one respect to account for misconduct by USCC in the earlier stages of its performance. Equitable principles govern the remedy of specific performance, and they do allow a court, under appropriate circumstances, to enforce some parts of a contract but not others, or with cause, to order performance different in some respects from that set out in the contract. *See, e.g., Castle v. Cohen,* 840 F.2d 173, 180 (3d Cir.1988); *Boyd v. Mercantile Safe Deposit and Trust Co.,* 28 Md.App. 18, 344 A.2d 148, 152 (1975); 5A Arthur Corbin, *Corbin on Contracts* § 1137 (1964). Gatewood argues that the district court's action fits this rule of equity.

■ We do not believe this argument advances Gatewood's position. A court may order specific performance of a contract at variance with its literal terms, only if it identifies equitable justifications for which evidence is wholly lacking in this case. Thus, courts may enforce part but

not all of an agreement either to fulfill the parties' actual intention, *see, e.g., Grand Union Co. v. Cord Meyer Dev. Co.,* 761 F.2d 141 (2d Cir.1985); *Premier Indus. Corp. v. Texas Indus. Fastener Co.,* 450 F.2d 444 (5th Cir.1971), or to remedy harm caused by unconscionable or inequitable conduct by one of the parties, *see, e.g., Grand Union Co.,* 761 F.2d at 147; *McFarland v. Gregory,* 322 F.2d 737, 739 (2d Cir.1963). Here, no one suggests that the original terms of the contract did not embody the parties' real intentions.

■ The linchpin of Gatewood's argument supporting an equitable modification of the terms of performance is that USCC's breaching conduct under the Agency Agreement effectively "coerced" or "wrongfully induced" Gatewood into exercising his put option on September 15, 1987. That argument fails, however, because it is without support in the record. First, the district court's detailed factual findings do not contain anything remotely suggestive of a nexus between the nonmaterial breaches it found by USCC and Gatewood's exercise of the put. Second, the evidence presented at trial would not have supported such a conclusion in any event.

What the district court did find was that even though USCC had on occasion been negligent in supplying Gatewood with current information on the progress of construction, it had nonetheless substantially performed its end of the deal. The court specifically rejected Gatewood's argument that USCC had tried to wrest control of the system in violation of the Agreement and FCC regulations. Although Gatewood himself testified that he was "frustrated" with USCC's failure to keep him informed, and that he feared the FCC might take action because of this failure, the court concluded that Gatewood's fears were unwarranted. Mem. op. at 19.

The most that can be gleaned from the record is that Gatewood experienced a continuous friction in dealing with his business partner, that he experienced the common frustrations of trying to manage a project from afar, and that USCC was sometimes negligent in performing some details of its

contractual duties during the construction of the cellular phone system. We find no evidence, however, that any of USCC's actions or omissions rose to the level of "coercion," or that Gatewood's decision to sell his interest in September, 1987 was based on other than his considered business judgment to recoup a substantial return on his investment at the earliest possible date.

Gatewood, in fact, did not appear to even raise the issue of coercion in regard to the exercise of the put option at trial. The evidence and factual findings of the district court show that Gatewood had control of the operation in that he always retained the power to terminate USCC as the construction agent. Mem. op. at 19. Under the circumstances, it strains credulity that an experienced businessman like Gatewood would have been induced against his will into selling his substantial interest by the relatively minor difficulties he experienced in dealing with USCC. In any event, the district court found that USCC substantially complied with its principal obligations under the Agreements. Moreover, Gatewood has been awarded compensation for the damages he suffered because of USCC's poor performance; allowing a greater recovery based on the relatively minor flaws in USCC's performance under the agreement would violate another equitable principle, *i.e.*, that the amount of recovery be proportionate to the extent of harm caused. *See, e.g., Harjo v. Andrus*, 581 F.2d at 952 (equitable relief should be tailored to demonstrated harm).

In sum, there was no finding by the district court nor evidence upon which one could be based that the First Partnership Agreement did not accurately reflect the intentions of the parties; there is no dispute that the parties considered the terms of the original Agreement, including the valuation date, to be fair, and that under the Agreement the valuation date for the

49% interest was October 15, 1987.[7] There was no finding nor evidence that USCC "coerced" Gatewood into exercising his put in September, 1987. Whether labeled a "reformation" or equitable modification of a specific performance remedy, the district court's action is without basis in law or fact. Its order changing the valuation date of Gatewood's 49% interest cannot stand.[8]

### III. CONCLUSION

For the foregoing reasons, we reverse the district court's decision changing the date for appraising the value of Gatewood's 49% interest to be purchased by USCC. The appraisal process should use October 15, 1987, as the valuation date.

*It is so ordered.*

---

**7.** Until the time of his amended complaint in March, 1988, Gatewood himself continually sought assurance that October 15, 1987, was to be the valuation date after the dramatic drop in cellular phone stock values in the wake of "Black Monday" in late October, 1987.

**8.** Our decision on the merits renders moot any issue regarding the need for a supersedeas bond. *See* Fed.R.Civ.P. 62. The parties have stipulated that a post-trial settlement agreement has now resolved all other issues; the three appraisers have been chosen and there is no obstacle to implementation of the appraisal process.