425 F.2d 443
 Walter P. McFARLAND, Edward P. Johnson, and John Loughran,
Plaintiffs-Appellants-Appellees,
v.
George S. GREGORY, Alexander Westreich, N.V.
Handelmaatschappij Antilia, Soldrescher and Louis
Rosenberg, Defendants-Appellees-Appellants.
 Nos. 285-290, Dockets 33291-33296.
 United States Court of Appeals, Second Circuit.
 Argued Feb. 3, 1970.
Decided April 24, 1970.
 
 1
 Richard L. Bond, New York City (Baker & McKenzie, New York City, Peter J. Gartland, New York City, of counsel), for appellant Walter P. McFarland.
 
 
 2
 Arthur S. Friedman, New York City (Tanner & Friedman, New York City), for appellant Edward P. Johnson.
 
 
 3
 Stuart A. Jackson, New York City (Royall, Koegel & Wells, New York City, Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City, Moses Krislov, Cleveland, Ohio, Gerald D. Stern, New York City, Aaron R. Fodiman, Arlington, Va., Thomas W. Towell, Jr., New York City, of counsel), for appellees.
 
 
 4
 Before WATERMAN and ANDERSON, Circuit Judges, and TYLER, District judge.*
 
 TYLER, District Judge:
 
 5
 Unyielding in their litigiousness, the parties return to this court for the fifth time in what is hopefully their final attempt to resolve the disputes arising out of the development of the Arlington Towers housing complex in Arlington, Virginia.[1] The core of this appeal is the claim of the appellants and cross appellees, plaintiffs below (hereinafter 'McFarland'), to damages for the failure of appellees and cross appellants, defendants below (hereinafter 'the Gregory group'), to perform their side of an option contract.[2] In 1957, after a series of troubled negotiations surrounding the development of the project, McFarland sold to the Gregory group his right to purchase Arlington Towers. Included in the sale contract was an option for McFarland to share in the profits of a purchase from the Gregory group of either the stock and debentures of Arlington Towers or of one or more of the four apartment buildings which formed the core, but not the entirety, of the Arlington Towers holding. If this second route of building purchase were pursued, it was a condition of the resale that the Gregory group's counsel determine that the profits distributed would be taxable as capital gains and not as ordinary income.
 
 
 6
 Difficulties quickly followed the negotiation of this agreement and were not resolved until 1961 when Judge Dimock extended the period during which the option rights of McFarland could be exercised and ordered the Gregory group to specifically perform the contract. On appeal, the time for performance was further extended to January, 1966, and the order of specific performance affirmed. McFarland v. Gregory, 322 F.2d 737 (2d Cir. 1963). In August 1965, McFarland exercised his option rights.
 
 
 7
 In the present suit, McFarland claims that the Gregory group impeded the exercise of his rights and but for that impeditive conduct he could and would have exercised his option rights at an earlier date. His primary damage claim is for the benefits that would have flowed to him as beneficial owner of the property had he exercised his rights at an earlier date. A trial lasting over seven months was held before Judge Dimock on this and related issues, and McFarland's claim was dismissed at the end of his presentation of evidence for failure to show that he could have financed the purchase at the contract's formula price and, at certain periods when he could have financed the purchase, that the Gregory group impeded him from doing so. Further, Judge Dimock refused to grant the Gregory group the costs of defense and as a 'sanction cost' under Rule 37, Fed.R.Civ.P., the court charged to the Gregory group the costs of their failure to provide for McFarland's accountants a proper working environment at discovery. McFarland appeals the dismissal of his case; the Gregory group appeals the ruling on the costs of defense and the Rule 37 sanction.
 
 
 8
 In the face of Judge Dimock's persuasive finding that McFarland failed to present proof at trial that he could have financed the exercise of his option rights, McFarland asks this court to rule that as a matter of law certain presumptions should have carried the argument for him in lieu of more concrete evidence. These three presumptions are the continuity presumption (if a situation exists at one point in time, it is to be presumed that it exists thereafter), see e.g. United States v. S. B. Penick & Co., 136 F.2d 413 (2d Cir. 1943), the backward relation presumption (if a situation exists at one point in time, it is to be presumed that it existed before that time), see e.g. United States v. Hamden Cooperative Creamery Co., 185 F.Supp. 541 (E.D.N.Y.1960), aff'd 297 F.2d 130 (2d Cir. 1961), and the bargain presumption (if one has the right to buy property below its fair market value, it is to be presumed that one can finance the purchase), see e.g. Scholle v. Cuban-Venezuelan Oil Voting Trust, 285 F.2d 318 (2d Cir. 1960).
 
 
 9
 The continuity presumption and the presumption of backward relation appear to be reasonable grounds on which to draw inferences where (1) a situation or the circumstances surrounding it do not go through an apparent material change and (2) the lapse of time is not great enough to suggest that unknown circumstances or causes, in the normal course of events, will have changed the situation. Each case must rest on its own bottom. It is on these terms that the better cases and commentaries have accepted these presumptions. E.g., 2 Wigmore on Evidence (3d Ed. 1940) 437 and cases collected therein ('no fixed rule can be laid down; the nature of the thing and the circumstances of the particular case must control'). These propositions are too obvious to merit extended discussion.
 
 
 10
 Unchanging or immutable circumstances do not exist in this case. The trial judge properly found that the terms of the Gregory group agreement varied significantly from the earlier financing arrangements entered into by McFarland and on which McFarland attempts to erect the argument for the continuity presumption. That presumption must fail here. Further, Judge Dimock found that, at best, the backward relation presumption would not carry McFarland backward beyond April 23, 1964, when a change in New York law would first have allowed the financing made in 1965. McFarland attempts to surmount this difficulty and to maintain the backward relation presumption by saying that companies in states other than New York having an appropriate legal structure would have made the loan eventually made by the New York insurance company. That may be, but it was McFarland's task to prove it. A presumption of relation backward has only a very limited worth and will not survive the changing of the parties and the legal limitations under which they operate without independently convincing proof that acts performed at a later date could be performed at an earlier date.
 
 
 11
 The trial judge found that McFarland's delay in the exercise of his option after April 23, 1964 was voluntary and not due to obstruction by the Gregory group. McFarland claims obstruction through the Gregory group's procurement of a tax opinion in which, because of the terms in which the transaction was proposed, counsel contended that the profit would not be taxable as capital gain. In propounding this argument McFarland faces the fact that in 1965 he did arrange financing despite the unfavorable tax opinion and thereafter obtained a ruling from Judge Dimock that, as a matter of law, the profits would be taxable as capital gain. In sum, McFarland's very theory of backward relation cuts against him here, and he was unable to present factually persuasive evidence to the district court showing that the obstacle of the tax opinion could not have been surmounted between April, 1964 and August, 1965. In seeking to escape this dilemma, McFarland maintains that the tender of August, 1965 grew out of settlement negotiations which were voluntarily entered by the Gregory group and which McFarland could never have demanded. But for the fortuitous circumstance of those negotiations, McFarland claims, the obstacle of the tax opinion could not have been surmounted. Whether or not the settlement negotiations alone made possible the procurement of financing is fundamentally a factual matter. We see nothing clearly erroneous in Judge Dimock's holding that the unfavorable tax opinion, wrong as a matter of law, was not a damaging impediment to McFarland's search for financing.
 
 
 12
 McFarland's final presumption, that a bargain can always be financed, depends crucially on proving that one has the right to a bargain. At trial, McFarland's major evidence for finding that he had a right to a bargain came from his witness Mulliken, the only expert presented by the plaintiffs. Judge Dimock dismissed Mulliken's testimony, and McFarland argues here that such a discounting of an expert must be reversed. In his opinion, Judge Dimock found that Mulliken's testimony showed ignorance of some of the basic facts surrounding the Arlington Towers complex, that Mulliken had never personally made a formal appraisal of the property, and cited various other indications that his opinion was conjectural. Experts are not exempt from the rules of evidence. In these circumstances, the lower court was justified in dismissing Mulliken's 'expert' testimony.
 
 
 13
 When the expert's testimony was dismissed, the proof of the facts necessary to sustain the bargain presumption became much more difficult. It was a burden which McFarland did not meet. There is simply insufficient material in the record to rule that Judge Dimock was wrong in holding against McFarland on his claimed proof of having the rights to a bargain. See Scholle v. Cuban-Venezuelan Oil Voting Trust, supra, at 322.
 
 
 14
 In his claim for damages arising from the conduct of the Gregory group, McFarland further contends that the issue of whether he could obtain the financing to exercise his option rights should have been considered res judicata by virtue of Judge Dimock's opinion of June 30, 1961. That opinion specifically stated that McFarland was to be given the opportunity to exercise his option rights in the future but that those rights were 'of a value which could not be adequately represented by a present dollar value.' As Judge Dimock pointed out in his opinion in this phase of the case, the earlier trial reached 'a determination of liability to perform and not a determination of liability for damages.' It is that second issue which is at stake here and which has not been litigated before. McFarland contends that determination of the first issue must decide the second, at least to the extent that there is no need for a further showing of financibility. That is not persuasive. The issue of ability to obtain financing to exercise an option in the future need not be tried out when the principal issue at stake is the liability of the other party to perform if the option should be exercised. Since it was not erroneous for the lower court to divide the issues at trial, the argument of res judicata will not aid McFarland here.
 
 
 15
 Next McFarland attempts a bootstrap argument that he should not have to prove financibility because of repudiation and obstruction by the Gregory group and their alleged frustration of the fruition of certain value-enhancing developments. These lines of attack essentially ignore McFarland's failure to prove obstructive acts by the Gregory group. Announcing impeditive conduct as a conclusion will not do. Moreover, even if the alleged acts were sufficiently shown, the shape of the contract giving McFarland a share of future sale profits would demand the proof of damages rather than an accounting of the profits derived from beneficial ownership. McFarland has not supplied this, and his argument must fail.
 
 
 16
 Apparently as an afterthought to the principal issues tried, McFarland suggests that alleged improper management of Arlington Towers resulted in diminishing the price he could reasonably have tendered and hence the share of the profit he received from sales. Here again McFarland runs into his old roadblock of failure to show financibility. Proof that McFarland could have exercised his option at a higher price, though necessary, was not presented.
 
 
 17
 McFarland's last claim is for damage allegedly caused to the property by the Gregory group during the period before McFarland exercised his option. In particular, McFarland claims that the Gregory group entered into sweetheart leases, improperly lured a major tenant into another of the group's buildings and allowed the property to deteriorate physically. In light of the contractual agreement, the course of defendants' conduct and the limited evidence presented at trial, Judge Dimock found that these arguments were insubstantial and failed to carry the day. We see no reason to disturb his ruling.[3]
 
 
 18
 The Gregory group also appeal two rulings of the lower court: the denial to them of costs and a ruling under Rule 37(b)(2), Fed.R.Civ.P., that they pay the difference between the reasonable costs of McFarland's accountants and the actual costs caused by the manner in which the Gregory group made its records available to McFarland. In the normal course, defendant would be allowed costs under Fed.R.Civ.P. 54(d) 'unless the court otherwise directs.' This was not, it seems safe to say, a trial in the normal course. Just in this latest phase of the case in the trial court, the presentation of plaintiffs' proof lasted more than seven months with over 16,000 pages of testimony and 800 numbered exhibits. In his opinion dated December 2, 1966, Judge Dimock discussed ten instances in which plaintiffs contended that the Gregory group and their counsel had so obstructed proper conduct of the litigation that they should be precluded from making any defense to the plaintiffs' claims. Judge Dimock denied that motion, concluding that defendants' behavior had not reached the point where they should be excluded from participation in the trial but also regretting that he thought himself powerless on that motion to reach a more appropriate disposition which would have imposed some form of sanction on defendants. In his opinion of December 31, 1968, which denied costs to defendants, Judge Dimock referred to his opinion of December 2, 1966 and further found that defendants and their counsel had continued their obstructive course of conduct. From the examples given in the two opinions, there is no basis to question Judge Dimock's conclusion that the defense was conducted 'in the tradition of the old fashioned total warfare' and the exercise of his discretion to 'prevent either party from keeping alive the vestige of trial by battle.'
 
 
 19
 The Rule 37 sanction ruling is more difficult and indeed painful to consider in the light of the obvious patience of the trial judge under extreme provocations over an extended period of time during the conduct of this litigation. Pursuant to Rule 37(b)(2), Fed.R. Civ.P., Judge Dimock imposed a sanction in the form of a penalty in the amount of $7,114.00. This penalty or sanction resulted from a finding of the judge that defendants produced certain accountants' records at the request of plaintiffs and at the direction of the court, but failed and refused to deliver them under appropriate conditions for evaluation, study and analysis by investigators acting for plaintiffs. It seems to be undisputed that the claim of default and the resultant sanction order were based upon a relatively unitemized affidavit submitted by one of plaintiffs' accountants, a Mr. Padrutt of Ernst & Ernst, from which the trial judge established the difference between actual cost of the accountants' work and what the reasonable cost would have been had the accountants had a proper working environment. As defendants urge, the sum involved cannot be said to be insignificant, even when compared with the large figures involved in the basic claims of the parties in this litigation. Also, it appears beyond question that the defendants were not allowed to cross-examine Padrutt in connection with his affidavit averments. Finally, as defendants argue, this sanction amounted to a separate judgment and is somewhat akin to a finding of and punishment for contempt without a hearing, including most especially the opportunity for cross-examination.
 
 
 20
 It is possible to infer from the record as a whole that Judge Dimock undoubtedly had good reasons in the light of the conduct of the defense of this action and the affidavits submitted on this specific issue to impose a sanction under Rule 37. We do not disturb that general finding. The protracted history of this litigation in itself makes us loath to upset any part of this determination. Nevertheless, considering the size of the penalty[4] we are constrained to conclude that the trial court should have afforded defendants an opportunity of a hearing on the scope and cost of their default before imposing a proper penalty therefor. In particular, we agree with the defendants that they should have been afforded an opportunity to cross-examine Mr. Padrutt, on whose affidavit the amount of the penalty so crucially rested.
 
 
 21
 Accordingly, the judgment of the court on the merits is affirmed, but the order and judgment imposing a penalty or sanction in the sum of $7,114.00 is reversed and remanded for further proceedings consistent with the foregoing opinion. No costs.
 
 
 
 *
 Sitting by designation
 
 
 [1]
 This can be no more than a hope. 'This bitterly contested controversy, in litigation since 1957, comes to us for what we trust will be the last time.' McFarland v. Gregory, 363 F.2d 857, 858 (2d Cir. 1966) (second appeal to this court)
 
 
 [2]
 In order to avoid filling yet more pages of the Federal Reporter with the tedious details of this bitter dispute, we will assume the factual background already developed in earlier opinions. See Arlington Towers Land Corp. v. John McShain, Inc., 150 F.Supp. 904 (D.D.C.1957), McFarland v. Gregory, 322 F.2d 737 (2d Cir. 1963), McFarland v. Gregory, 363 F.2d 857 (2d Cir. 1966), McFarland v. Gregory, 373 F.2d 393 (2d Cir. 1967), McFarland v. Gregory, 376 F.2d 12 (2d Cir. 1967), McFarland v. Gregory, 124 Civ. 217 (S.D.N.Y. May 13, 1968). It is cases of this sort that have made Bleak House an historic best seller
 
 
 [3]
 Because of McFarland's failure to show financibility, it is unnecessary for us to reach the question of what damage, if any, McFarland would have suffered had he been able to finance a deal before August, 1965
 
 
 [4]
 Compare with other cases in which a cost sanction has been imposed under Rule 37(b). Hendricks v. Alcoa Steamship Co., 32 F.R.D. 169, 171-172 (E.D.Pa.1963) (approximately $850; defendant did not contest plaintiff's claim of $1,000 for time and expenses incurred due to defendant's failure to comply with 'the orders of the Court and the spirit of the rules'); Austin Theatre, Inc. v. Warner Bros. Pictures, Inc., 22 F.R.D. 302 (S.D.N.Y.1958) ($50); Bernat v. Pennsylvania R. Co., 14 F.R.D. 465 (E.D.Pa.1953) ($50)